**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Sean L. Litteral (State Bar No. 331985)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-Mail:   ltfisher@bursor.com
              slitteral@bursor.com

**BURSOR & FISHER, P.A.**
Max S. Roberts (*pro hac vice* forthcoming)
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
Email:  mroberts@bursor.com

*Attorneys for Plaintiff and the Proposed Classes*
[Additional counsel listed on signature page]

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KAMILA HARKAVY, individually and on behalf of all others similarly situated,<br><br>              Plaintiff,<br><br>      v.<br><br>GODIVA CHOCOLATIER, INC.,<br><br>              Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

CLASS ACTION COMPLAINT

Plaintiff Kamila Harkavy, individually and on behalf of all others similarly situated, alleges the following against Defendant Godiva Chocolatier, Inc., ("Godiva" or "Defendant") on information and belief, except that Plaintiff's allegations as to their own actions are based on personal knowledge.

## NATURE OF THE ACTION

1. This action seeks to recover damages and injunctive relief for Defendant's continuing failure to disclose to consumers that certain the Godiva Signature Dark Chocolate 72% Cacao bar (the "Product") contains unsafe levels of lead.

2. Dark chocolate is often touted as being a healthier alternative to milk chocolate, however, a December 2022 report by Consumer Reports revealed that certain dark chocolate bars, including the Product, had high enough levels of lead and cadmium that "eating just an ounce a day would put an adult over a level that public health authorities and [Consumer Reports'] experts say may be harmful."[1]

3. Lead in food poses a significant safety risk to consumers because it can cause cancer and often irreversible damage to brain development as well as other serious health problems.

4. As described more fully below, consumers who purchase the Product are injured by Defendant's acts and omissions concerning the presence (or risk) of lead. No reasonable consumer would know, or have reason to know, that the Product contains (or risked containing) lead. Worse, as companies across the industry have adopted methods to limit lead in their dark chocolates, Defendant has stood idly by with a reckless disregard for its consumers' health and well-being. As such, Plaintiff seeks relief in this action individually and as a class action on behalf of all purchasers of the Product.

## PARTIES

5. Plaintiff Kamila Harkavy is a resident of California, and resides in the city of Sausalito, California. Plaintiff Harkavy has purchased Defendant's Product and has consumed the

---

[1] Kevin Loria, *lead and Cadmium Could be in Your Dark Chocolate*, CONSUMER REPORTS (December 15, 2022), https://www.consumerreports.org/health/food-safety/lead-and-cadmium-in-dark-chocolate-a8480295550/.

Product numerous times during the class period. Typically, Plaintiff Harkavy has purchased the Product from Cost Plus, Grocery Outlet, and Mollie Stones in and around Sausalito, California. Plaintiff Harkavy believed she was purchasing quality and safe dark chocolate that did not contain (or risk containing) lead. Had Defendant disclosed on the label that the Product contained (or risked containing) unsafe toxic lead, Ms. Harkavy would have been aware of that fact and would not have purchased the Product or would have paid less for it.

6. Ms. Harkavy continues to desire to purchase the Product from Defendant. However, Ms. Harkavy is unable to determine if the Product is actually safe. Ms. Harkavy understands that the composition of the Product may change over time. But as long as Defendant continues to market its Product as safe, she will be unable to make informed decisions about whether to purchase Defendant's Product and will be unable to evaluate the different prices between Defendant's Product and competitor's Product. Ms. Harkavy is further likely to be repeatedly misled by Defendant's conduct, unless and until Defendant is compelled to ensure that the Product marketed, labeled, packaged and sold as safe dark chocolate is, in fact, safe to consume.

7. Defendant Godiva Chocolatier, Inc., is a New Jersey corporation with its headquarters in New York, New York. Defendant manufactures, markets, and sells dark chocolate, including the Product, throughout California and the United States. During the relevant period, Defendant controlled the manufacture, design, testing, packaging, labeling, marketing, advertising, promotion, distribution, and sales of its Product. Defendant therefore had complete control over how to label its Product as to their contents.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, Pub. L. No. 109-2 Stat. 4 ("CAFA"), which, *inter alia*, amends 28 U.S.C. § 1332, at new subsection (d), conferring federal jurisdiction over class actions where, as here: (a) there are 100 or more members in the proposed classes; (b) some members of the proposed classes have a different citizenship from Defendant; and (c) the claims of the proposed

class members exceed the sum or value of five million dollars ($5,000,000) in aggregate. *See* 28 U.S.C. § 1332(d)(2) and (6).

9. This Court has specific jurisdiction over Defendant because the events giving rise to this action occurred in California and Defendant markets and sells its Product in California and avails itself of the privilege of conducting business in California to such an extent that suit was foreseeable.

10. Venue is proper in this Court under 28 U.S.C. § 1391 because Defendant transacts significant business within this District, at least one Plaintiff resides within this District, and a substantial part of the events giving rise to Plaintiff's claims took place within this District.

## FACTS COMMON TO ALL CAUSES OF ACTION

**I.   Lead is Toxic**

11. Lead is a heavy metal. As described more fully below, the harmful effects of lead are well-documented, particularly on children. Exposure puts children at risk for lowered IQ, behavioral problems (such as attention deficit hyperactivity disorder), type 2 diabetes, and cancer, among other health issues. lead also pose risks to adults. Even modest amounts of lead can increase the risk of cancer, cognitive and reproductive problems, and other adverse conditions. As such, it is important to limit exposure.

12. "No amount of lead is known to be safe."[2] Exposure to lead may cause anemia, weakness, and kidney and brain damage.[3] lead can affect almost every organ and system in the body. lead accumulates in the body over time, and can lead to health risks and toxicity, including inhibiting neurological function, anemia, kidney damage, seizures, and in extreme cases, coma and death. lead can also cross the fetal barrier during pregnancy, exposing the mother and developing fetus to serious risks, including reduced growth and premature birth. lead exposure is also harmful

---

[2] *See* https://www.npr.org/sections/thetwo-way/2016/08/13/489825051/lead-levels-below-epa-limits-can-still-impact-your-health (last accessed June 22, 2022).
[3] Centers for Disease Control and Prevention, "Health Problems Caused by lead," *The National Institute for Occupational Safety and Health (NIOSH)*, https://www.cdc.gov/niosh/topics/lead/health.html#:~:text=Exposure%20to%20high%20levels%20of,a%20developing%20baby's%20nervous%20system. (last accessed June 22, 2022).

to adults as more than 90 percent of the total body burden of lead is accumulated in the bones, where it is stored. lead in bones may be released into the blood, re-exposing organ systems long after the original exposure.[4]

## II. Defendant's Product Contains Toxic Lead

13. In December of 2022, Consumer Reports published a report titled "Lead and Cadmium Could Be in Your Dark Chocolate." The report detailed the results of Consumer Reports' testing of various dark chocolates for lead and cadmium. To determine the risk posed by the chocolates in the test, Consumer Reports measured the chocolates with reference to California's maximum allowable dose level (MADL) for lead (0.5 micrograms) and cadmium (4.1 micrograms).

14. Consumer Reports analyzed 28 different bars.

15. Consumer Reports determined that "[f]or 23 of the bars, eating just an ounce a day would put an adult over a level that public health authorities and CR's experts say may be harmful for at least one of those lead. Five of the bars were above those levels for both cadmium and lead."[5]

16. Godiva's "Excellence Dark Chocolate 70% Cocoa" bar was found to have lead levels at 146% of the MADL.

17. With regard to the results, Tunde Akinleye, a food safety researcher at Consumer Reports who led the project, remarked that "the danger is greatest for pregnant people and young children because the metals can cause developmental problems … but there are risks for people of any age" because frequent exposure to lead can lead to nervous system problems, hypertension, immune system suppression, kidney damage, and reproductive issues.[6]

18. While lead can be found in many food sources, the Godiva Product, *on its own*, exposes consumers to 146% of the MADL for lead in a single one ounce serving.[7]

---

[4] State of New York Department of Health, "lead Exposure in Adults: A Guide for Health Care Providers," https://www.health.ny.gov/publications/2584.pdf (last accessed June 22, 2022).
[5] Loria, *supra* note 1.
[6] *Id.*
[7] *Id.*

CLASS ACTION COMPLAINT                                                                                        4

19. Chocolate is made from the cacao bean, which has two main components: cocoa solids and cocoa butter. Together, these are called cacao or cocoa.

20. Dark chocolate, rather than milk chocolate, was the subject of these tests because dark chocolate has a higher percentage of cacao, at least 65 percent cacao by weight, which is where the lead lurks.

21. Lead gets into the dark chocolate because lead gets on the outer shell of cacao beans after they are harvested as they are dried outside.

22. However, this does not mean that lead exposure is inevitable when consuming dark chocolate.  As Consumer Reports noted, five of the 28 chocolate bars tested were below the MADL for both cadmium and lead, proving that "it's possible for companies to make chocolate with lower amounts of lead—and for consumers to find safer chocolate products that they enjoy."[8]

23. Instead of adequately testing its Product like its competitors, Defendant chose to ignore the health of the consuming public in pursuit of profit.

**III.   The Presence (or Risk) of Toxic lead in Defendant's Product Far Exceeds Expectations of Reasonable Consumers**

24. According to Verified Market Research, the dark chocolate market was valued at $56.09 billion in 2021 and is expected to grow to $114.62 billion by 2030.[9]  Indeed, "[g]rowing health benefits associated with cocoa-rich dark chocolates, rising demand for premium dark chocolates as gifts, players introducing more limited-edition seasonal chocolates, increasing online sales, and expanding marketing initiatives are expected to drive the global Dark Chocolate Market during the forecast period."[10]

25. What's more, up to 15% of consumers eat dark chocolate on a daily basis.[11]

26. Given the negative effects of lead on child development and adult health, the

---

[8] *Id.*
[9] *Dark Chocolate Market Size and Forecast*, VERIFIED MARKET RESEARCH (May 2022), https://www.verifiedmarketresearch.com/product/global-dark-chocolate-market/#:~:text=Dark%20Chocolate%20Market%20was%20valued,8.28%25%20from%202022%20to%202030 (last accessed January 03, 2023).
[11] Loria, *supra* Note 1.

presence of these substances in dark chocolate is a material fact to reasonable consumers, including Plaintiff and members of the Class.

27. This is not the first time that Defendant has been alerted to the fact that its dark chocolate products contain unsafe levels of lead.

28. In 2014 Defendant's dark chocolate products were tested by a consumer advocacy group and Defendant was informed that some of its dark chocolate products had dangerously high levels of lead, a subject of concern for the group and for consumers at large.

29. As such, Defendant knows that the presence (or risk) of toxic lead in its Product is a material fact to reasonable consumers, including Plaintiff and the Class members.

30. Food manufacturers (such as Defendant) hold a position of public trust. Consumers believe that they would not sell the Product if it was contaminated with unsafe levels of lead.

31. Defendant knew that if the presence (or risk) of toxic lead in its Product was disclosed to Plaintiff and the Class members, then Plaintiff and the Class members would be unwilling to purchase it or would pay less for it.

32. In light of Defendant's knowledge that Plaintiff and the Class members would be unwilling to purchase the Product or would pay less for the Product if they knew that it contained (or risked containing) toxic lead, Defendant intentionally and knowingly concealed this fact from Plaintiff and the Class members and did not disclose the presence (or risk) of lead on the label of the Product.

33. Defendant knew or should have known that Plaintiff and the Class members would rely upon the label of the Product and intended for them to do so, but failed to disclose the presence (or risk) of lead.

34. Defendant knew or should have known that it owed consumers a duty of care to adequately test for lead in the Product, which it failed to do.

35. Additionally, Defendant knew or should have been aware that a reasonable consumer could consume a one ounce serving of the Product daily, leading to repeated exposure to the lead at unsafe levels.

36. As such, Defendant has a duty to disclose that consumption of the Product could expose consumers to high levels of the toxic lead.

37. Defendant knew or should have known it could control the levels of lead in the Product by properly monitoring the ingredients for lead and adjusting any cultivation practices to reduce or eliminate the accumulation of lead on the cocoa beans, as other chocolate manufacturers have done.

38. It is reasonable to assert that Defendant knew or should have known it could control the levels of lead in its Product because there are other chocolate manufacturers who have been able to produce dark chocolate with significantly less lead than Defendant's Product.

39. Prior to purchasing the Product, Plaintiff and the Class members were exposed to, saw, read, and understood Defendant's labels, and relied upon them in purchasing the Product, but Defendant failed to disclose the presence (or risk) of lead.

40. As a result of Defendant's concealment of the fact that the Product contained toxic lead, Plaintiff and the Class members reasonably believed that Defendant's Product was free from substances that would negatively affect children's development as well as their own health.

41. In reliance upon Defendant's labels that contained omissions, Plaintiff and the Class members purchased Defendant's Product.

42. Had Plaintiff and the Class members known the truth—*i.e.*, that the Product contained (or risked containing) toxic lead, rendering it unsafe for consumption by children and adults—they would not have been willing to purchase it or would have paid less for it.

43. Therefore, as a direct and proximate result of Defendant's omissions concerning the Product, Plaintiff and the Class members purchased the Product.

44. Plaintiff and the Class members were harmed in the form of the monies they paid for the Product which they would not otherwise have paid had they known the truth about the Product. Since the presence (or risk) of toxic lead in the Product renders it unsafe for human consumption, the Product that Plaintiff and the Class members purchased was worthless or was worth less than Plaintiff and the Class paid for it. What's more, there are other dark chocolate

1  Product on the market which contain significantly lower levels of lead than Defendant's Product,
2  meaning that there are safer alternatives to Defendant's Product.
3      45.   The Product's label is materially deceptive, false and misleading given Defendant's
4  omission about the presence (or risk) of lead as described above.

### FED. R. CIV. P. 9(b) ALLEGATIONS

46. Rule 9(b) of the Federal Rules of Civil Procedure provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." To the extent necessary, as detailed in the paragraphs above and below, Plaintiff has satisfied the requirements of Rule 9(b) by establishing the following elements with sufficient particularity.

47. **WHO**: Defendant made material omissions of fact in its packaging of the Product by omitting the presence (or risk) of significant amounts of unsafe lead.

48. **WHAT**: Defendant's conduct was and continues to be fraudulent and deceptive because it has the effect of deceiving consumers into believing that the Product does not contain (or risk containing) significant amounts of lead. Defendant omitted from Plaintiff and Class members that the Product contains (or risk containing) lead. Defendant knew or should have known this information is material to all reasonable consumers and impacts consumers' purchasing decisions. Yet, Defendant has omitted from the Product's labeling the fact that it contains (or risks containing) lead.

49. **WHEN**: Defendant omitted from the Product's labeling the fact that the Product contains (or risks containing) significant amounts of unsafe lead, continuously throughout the applicable relevant periods, including at the point of sale.

50. **WHERE**: Defendant's omissions were made on the front labeling and packaging of the Product and were thus viewed by every purchaser, including Plaintiff, at the point of sale in every transaction. The Product is sold in brick-and-mortar stores and online stores nationwide.

51. **HOW**: Defendant omitted from the Product's labeling the fact that it contains (or risks containing) lead. And as discussed in detail throughout this Complaint, Plaintiff and Class members read and relied on Defendant's front-label omissions before purchasing the Product.

52. **WHY**: Defendant omitted from the Product's labeling the fact that it contains (or risks containing) lead for the express purpose of inducing Plaintiff and Class members to purchase the Product at a substantial price premium or more than they would have paid had they known the truth about the Product. As such, Defendant profited by selling the Product to at least thousands of consumers throughout the nation, including Plaintiff and the Class members.

## CLASS ACTION ALLEGATIONS

53. Plaintiff brings this action individually and on behalf of all other persons similarly situated pursuant to Federal Rule of Civil Procedure 23. The class definition(s) may depend on the information obtained throughout discovery. Notwithstanding, at this time, Plaintiff brings this action and seek certification of the following proposed classes (collectively, the Classes):

> **Class**: All persons within the United States who purchased the Product from the beginning of any applicable limitations period through the date of judgment.

54. Plaintiff Harkavy also bring this action on behalf of the following Subclass:

> **California Subclass**: All persons who purchased the Product in the State of California from the beginning of any applicable limitations period through the date of judgment.

55. Excluded from the proposed Classes are the Defendant, and any entities in which the Defendant has controlling interest, the Defendant's agents, employees and its legal representatives, any Judge to whom this action is assigned and any member of such Judge's staff and immediate family, and all resellers of the Product.

56. Plaintiff reserves the right to amend the definition of the Classes if discovery or further investigation reveals that the Classes should be expanded or otherwise modified.

57. Plaintiff further reserves the right to amend the above class definition as appropriate after further investigation and discovery, including by seeking to certify a narrower multi-state class (or classes) in lieu of a nationwide class if appropriate.

58. **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** At this time, Plaintiff does not know the exact number of members of the Classes; however, given the nature of the claims and the number of retail stores in the United States selling the Product, Plaintiff believes

that the Class members are so numerous that joinder of all members is impracticable. While the exact number of Class members remains unknown at this time, upon information and belief, there are thousands, if not hundreds of thousands, of putative Class members. Moreover, the number of members of the Classes may be ascertained from Defendant's books and records. Class members may be notified of the pendency of this action by mail and/or electronic mail or other appropriate digital means, which can be supplemented if deemed necessary or appropriate by the Court with published notice.

59. **Predominance of Common Questions of Law and Fact – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Classes that predominate over questions that may affect individual Class members include:

   a. whether the Product contains toxic lead;
   b. whether Defendant's conduct is unethical, oppressive, unscrupulous, and/or substantially injurious to consumers;
   c. whether the amount of lead in the Product is material to a reasonable consumer;
   d. whether Defendant had a duty to disclose that its Product had lead;
   e. whether Plaintiff and members of the Classes are entitled to injunctive and other equitable relief;
   f. whether Defendant failed to disclose material facts concerning the Product;
   g. whether Defendant's conduct was unfair and/or deceptive;
   h. whether Defendant has been unjustly enriched as a result of the unlawful, fraudulent, and unfair conduct alleged in this Complaint such that it would be inequitable for Defendant to retain the benefits conferred upon Defendant by Plaintiff and the Class members;
   i. whether Defendant violated California consumer protection and deceptive practice statutes and are entitled to restitution and/or damages under such state statutes; and

j.  whether Plaintiff and the Class members have sustained damages with respect to the common-law claims asserted, and if so, the proper measure of their damages.

60. **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of those of the Class members because Plaintiff, like other Class members, purchased, in a typical consumer setting, the Product and Plaintiff sustained damages from Defendant's wrongful conduct.

61. **Adequacy – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff will fairly and adequately protect the interests of the Class members and have retained counsel that is experienced in litigating complex class actions. Plaintiff has no interests which conflict with those of the Classes.

62. **Insufficiency of Separate Actions – Federal Rule of Civil Procedure 23(b)(1).** Absent a class action, Plaintiff and members of the Classes will continue to suffer the harm described herein, for which they would have no remedy. Even if separate actions could be brought by individual consumers, the resulting multiplicity of lawsuits would cause undue burden and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated consumers, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Defendant.

63. **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** Defendant has acted or refused to act on grounds generally applicable to Plaintiff and the other members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the members of the Classes as a whole. In particular, Plaintiff seeks to certify the Classes to enjoin Defendant from selling or otherwise distributing the Product until such time that Defendant can demonstrate to the Court's satisfaction that the Product are accurately labeled. The prerequisites to maintaining a class action for equitable relief are met as Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate equitable relief with respect to the Classes as a whole.

64. **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available methods for the fair and efficient adjudication of the present controversy for at least the following reasons:

    a. The damages suffered by each individual members of the putative Classes do not justify the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct;

    b. Even if individual members of the Classes had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed;

    c. The claims presented in this case predominate over any questions of law or fact affecting individual members of the Classes;

    d. Individual joinder of all members of the Classes is impracticable;

    e. Absent a Class, Plaintiff and members of the putative Classes will continue to suffer harm as a result of Defendant's unlawful conduct; and

    f. This action presents no difficulty that would impede its management by the Court as a class action, which is the best available means by which Plaintiff and members of the putative Classes can seek redress for the harm caused by Defendant.

    g. In the alternative, the Classes may be certified for the following reasons:

        i. The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudication with respect to individual members of the Classes, which would establish incompatible standards of conduct for Defendant;

        ii. Adjudications of claims of the individual members of the Classes against Defendant would, as a practical matter, be dispositive of the interests of other members of the putative Classes who are not parties to the adjudication and may substantially impair or impede the ability of other putative Class members to protect their interests; and

      iii.    Defendant has acted or refused to act on grounds generally applicable to the members of the putative Classes, thereby making appropriate final and injunctive relief with respect to the putative Classes as a whole.

## CAUSES OF ACTION

### FIRST COUNT
### Unjust Enrichment

65. Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if fully stated herein.

66. Plaintiff brings this claim individually and on behalf of the members of the Classes against Defendant under the laws of California.

67. Plaintiff and the Class members conferred a benefit on Defendant in the form of the gross revenues Defendant derived from the money they paid to Defendant.

68. Defendant had an appreciation or knowledge of the benefit conferred on it by Plaintiff and the Class members.

69. Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff and the Class members' purchases of the Product, which retention of such revenues under these circumstances is unjust and inequitable because Defendant omitted that the Product contained (or risked containing) lead.  This caused injuries to Plaintiff and members of the Classes because they would not have purchased the Product or would have paid less for it if the true facts concerning the Product had been known.

70. Defendant accepted and retained the benefit in the amount of the gross revenues it derived from sales of the Product to Plaintiff and the Class members.

71. Defendant has thereby profited by retaining the benefit under circumstances which would make it unjust for Defendant to retain the benefit.

72. Plaintiff and the Class members are, therefore, entitled to restitution in the form of the revenues derived from Defendant's sale of the Product.

73. As a direct and proximate result of Defendant's actions, Plaintiff and Class members have suffered in an amount to be proven at trial.

74. Here, equitable relief is appropriate because Plaintiff may lack an adequate remedy at law if, for instance, damages resulting from their purchase of the Product is determined to be an amount less than the premium price of the Product. Without compensation for the full premium price of the Product, Plaintiff would be left without the parity in purchasing power to which they are entitled.

75. Injunctive relief is also appropriate, and indeed necessary, to require Defendant to provide full and accurate disclosures regarding the Product so that Plaintiff and Class members can reasonably rely on Defendant's packaging as well as those of Defendant's competitors who may then have an incentive to follow Defendant's deceptive practices, further misleading consumers.

76. Restitution may also be more certain, prompt, and efficient than other legal remedies requested herein. The return of the full premium price will ensure that Plaintiff is in the same place they would have been in had Defendant's wrongful conduct not occurred, i.e., in the position to make an informed decision about the purchase of the Product absent omissions with the full purchase price at their disposal.

## SECOND COUNT
### Violation of California's Unfair Competition Law ("UCL")
### Cal. Bus. & Prof. Code § 17200 *et seq.*,

77. Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if fully stated herein.

78. Plaintiff brings this claim individually and on behalf of the California Subclass members.

79. The UCL broadly prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

80. Defendant's acts, as described above, constitute unlawful, unfair, and fraudulent business practices pursuant to California Business & Professions Code §§ 17200, *et seq*. This

conduct includes but is not limited to its failure to disclose that the Product contains (or risks containing) lead.

81. Defendant has violated the UCL's proscription against engaging in **Fraudulent Business Practices.** After reviewing the packaging for the Product, Plaintiff purchased the Product in reliance on Defendant's omissions. Plaintiff would not have purchased the Product at all or would have paid less for it if they had known of Defendant's omissions regarding that the Product contained (or risked containing) lead. Plaintiff and the California Subclass members have all paid money for the Product. However, Plaintiff and the California Subclass members did not obtain the full value or any value of the advertised Product due to Defendant's omissions regarding the lead. Accordingly, Plaintiff and the California Subclass members have suffered injury in fact and lost money or property as a direct result of Defendant's omissions.

82. Defendant has also violated the UCL's proscription against engaging in **Unlawful Business Practices** by, *inter alia*, making omissions of material facts, as set forth more fully herein, and violating Cal. Civ. Code § 1750 *et seq*. Plaintiff purchased the Product in reliance on Defendant's omissions as to the toxic lead contained therein (or the risk of same). Plaintiff would not have purchased the Product at all or would have paid less for it had they known of Defendant's omissions. Plaintiff and the California Subclass members paid money for the Product. However, Plaintiff and the California Subclass members did not obtain the full value, or any value, of the advertised Product due to Defendant's omissions regarding the Product. Accordingly, Plaintiff and the California Subclass members have suffered injury in fact and lost money or property as a direct result of Defendant's omissions.

83. Defendant has further violated the UCL's proscription against engaging in **Unfair Business Practices**. Under Business & Professions Code §17200, any business act or practice that is unethical, oppressive, unscrupulous, and/or substantially injurious to consumers, or that violates a legislatively declared policy, constitutes an unfair business act or practice.

84. Defendant has engaged, and continues to engage, in conduct which is immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers. This conduct includes its failure to disclose that the Product contains (or risks containing) lead.

85. Defendant's conduct is substantially injurious to consumers. Such conduct has caused, and continues to cause, substantial injury to consumers because consumers would not have purchased the Product at all or would have paid less for them but for Defendant's omissions regarding the presence (or risk) of lead in the Product. Such injury is not outweighed by any countervailing benefits to consumers or competition. Indeed, no benefit to consumers or competition results from Defendant's conduct. Since consumers reasonably rely on Defendant's labels, and thus also its omissions, consumers could not have reasonably avoided such injury. *Davis v. Ford Motor Credit Co.*, 179 Cal. App. 4th 581, 597-98 (2009); *see also Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 257 (2010) (outlining the third test based on the definition of "unfair" in Section 5 of the FTC Act).

86. There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein.

87. Pursuant to California Business and Professional Code § 17203, Plaintiff and the California Subclass members seek an order of this Court that includes, but is not limited to, an order requiring Defendant to (a) provide restitution to Plaintiff and the other California Subclass members; (b) disgorge all revenues obtained as a result of violations of the UCL; and (c) pay Plaintiff and the California Subclass members' attorneys' fees and costs.

88. Here, equitable relief is appropriate because Plaintiff may lack an adequate remedy at law if, for instance, damages resulting from their purchase of the Product is determined to be an amount less than the premium price of the Product. Without compensation for the full premium price of the Product, Plaintiff would be left without the parity in purchasing power to which they are entitled.

89. Injunctive relief is also appropriate, and indeed necessary, to require Defendant to provide full and accurate disclosures regarding the Product so that Plaintiff and California Subclass

members can reasonably rely on Defendant's packaging as well as those of Defendant's competitors who may then have an incentive to follow Defendant's deceptive practices, further misleading consumers.

90. Restitution and/or injunctive relief may also be more certain, prompt, and efficient than other legal remedies requested herein. The return of the full premium price, and an injunction requiring either (1) adequate disclosures of the existence of lead in the Product; or (2) the removal of such lead from the Product, will ensure that Plaintiff is in the same place they would have been in had Defendant's wrongful conduct not occurred, i.e., in the position to make an informed decision about the purchase of the Product absent omissions with the full purchase price at their disposal.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court grant Plaintiff and all members of the proposed Classes the following relief against Defendant:

a. That the Court certify the Classes under Rule 23 of the Federal Rules of Civil Procedure and appoint Plaintiff as Class Representatives and their attorneys as Class Counsel to represent the members of the Classes;

b. That the Court declare that Defendant's conduct violates the statutes referenced herein;

c. That the Court preliminarily and permanently enjoin Defendant from conducting business through the unlawful, unfair, or fraudulent business acts or practices, untrue, and misleading labeling and marketing and other violations of law described in this Complaint;

d. That the Court order preliminary and injunctive relief requiring Defendant to disclose that the Product contains lead;

e. That the Court order Defendant to implement whatever measures are necessary to remedy the unlawful, unfair, or fraudulent business acts or practices, untrue and misleading advertising, and other violations of law described in this Complaint;

  f. That the Court order Defendant to notify each and every individual who purchased the Product of the pendency of the claims in this action to give such individuals an opportunity to obtain restitution from Defendant;

  g. For an award of compensatory damages, the amount of which is to be determined at trial;

  h. For punitive damages;

  i. That the Court grant Plaintiff's reasonable attorneys' fees and costs of suit pursuant to California Code of Civil Procedure §1021.5, California Civil Code §1780(d), the common fund doctrine, and/or any other appropriate legal theory; and

  j. That the Court grant such other and further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated: January 10, 2023    **BURSOR & FISHER, P.A.**

            By: */s/ L. Timothy Fisher*

            L. Timothy Fisher (State Bar No. 191626)
            Sean L. Litteral (State Bar No. 331985)
            1990 North California Blvd., Suite 940
            Walnut Creek, CA  94596
            Telephone: (925) 300-4455
            Facsimile:  (925) 407-2700
            Email:  ltfisher@bursor.com
               slitteral@bursor.com

            **BURSOR & FISHER, P.A.**
            Max S. Roberts (*pro hac vice* forthcoming)
            888 Seventh Avenue
            New York, NY 10019
            Telephone: (646) 837-7150
            Facsimile:  (212) 989-9163
            Email:  mroberts@bursor.com

            **LAUKAITIS LAW FIRM LLC**
            Kevin Laukaitis (*pro hac vice* forthcoming)
            737 Bainbridge Street, #155
            Philadelphia, PA 19147

Phone: (215) 789-4462
Email: klaukaitis@laukaitislaw.com

*Attorneys for Plaintiff*